UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| M.L. JOHNSON FAMILY PROPERTIES, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Civil No. 16-6-ART |
| v. | ) ) ) | **MEMORANDUM OPINION** |
| SALLY JEWELL, *Secretary of the Interior*, | ) ) ) | **AND ORDER** |
| Defendant, | ) ) | |
| and | ) ) | |
| PREMIER ELKHORN COAL LLC, | ) ) | |
| Intervenor Defendant. | ) | |

*** *** *** ***

The doctrine requiring parties to finish up their agency proceedings before coming to federal court is called exhaustion. It will be clear by the end of this Opinion that the doctrine deserves the name.

M.L. Johnson Family Properties filed this suit while still involved in a related agency action. The targets of that complaint now argue that Johnson's eagerness—and failure to exhaust—deprives the Court of subject-matter jurisdiction. The exhaustion doctrine requires parties to receive a final agency decision before filing a complaint. Except when it doesn't. As it turns out, "mandatory" does not always quite mean mandatory. Nor does "final" always quite mean final. Answering this case thus requires figuring out just how mandatory exhaustion is here and whether Johnson has received a final-enough agency decision.

## I.      Background

Johnson, a company made up of five siblings, owns a majority interest in the surface area of some land in Virgie, Kentucky.  R. 1 ¶¶ 6–7.  The land has spawned a lot of litigation.  The problem is that it sits on coal, coal that Premier Elkhorn Coal LLC would like to get.  Elkhorn has leased the rights to the coal and received permission from one minority-interest landowner to mine it.  R. 37 at 10.  Armed with this consent, Elkhorn obtained a permit to begin surface mining on the tract.  *Id.*

Once Elkhorn broke ground, Johnson sued it and the Secretary of the Interior, hoping to stop Elkhorn's machines in their tracks.  *M.L. Johnson Family Properties, LLC v. Jewell*, 27 F. Supp. 3d 767, 768–70 (E.D. Ky. 2014).  Because Elkhorn had not received Johnson's consent, the Court ordered it to stop pending an inspection by the Secretary.  *Id.* at 773–75.  Later, an arm of the Secretary—the Office of Surface Mining Reclamation and Enforcement (OSMRE)—inspected Elkhorn's permit, found it invalid, and issued a cessation order, which prohibited Elkhorn from mining the land any further.  *See* R. 37 at 11–12.

After the Johnson-Elkhorn dispute meandered a while through the agency's review system, OSMRE terminated the cessation order that had been blocking Elkhorn's machines.  An administrative law judge (ALJ) from the Department of the Interior affirmed the decision.  *Id.* at 13–15.  Johnson appealed the ALJ's ruling to the Appeals Board, while also petitioning the Board to stay that ruling until it had resolved the appeal.  *Id.* at 15.  Days passed without action from the Board.  Forty-five days after Johnson's deadline for taking the appeal, the Board had still taken no action.  So Johnson sued the Secretary of the Interior in this Court.  *See* R. 1; *see also* 43 C.F.R. § 4.21(b)(4) ("[The] Appeals Board shall grant or deny a petition

2

for a stay pending appeal . . . within 45 calendar days of the expiration of the time for filing a notice of appeal."). Johnson seeks the same relief here that it had sought from the agency: to vacate the ALJ's ruling and to have the cessation order reinstated. R. 1 at 7.

After Johnson filed his federal court complaint, Johnson asked the Appeals Board to dismiss its agency appeal, arguing that the Board's jurisdiction over it ended with the forty-five-day wait. R. 37 at 15. The Board granted the request, but also took a moment to "correct Johnson's erroneous assertion that this Board's jurisdiction to rule on the Petition for Stay and the merits of its appeal ended when this Board did not rule" on Johnson's petition within forty-five days. R. 35-1 at 3 (internal quotation marks omitted). Johnson asked the Board to reconsider its reasoning, but again withdrew the motion. *Id*. Johnson believes the wait created a final—and therefore reviewable—agency action; the Secretary believes otherwise.

The Secretary of the Interior now moves for judgment on the pleadings. R. 35. "[W]hat really is at issue here," however, "is a jurisdictional challenge to the allegations in the complaint." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). According to Rule 12, the Court must dismiss this case if it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3). The Secretary—and Elkhorn, who has intervened as a defendant—argue that Johnson came to this Court too early. R. 35; R. 36. As such, they say, the Court has no jurisdiction over Johnson's complaint. R. 35-1 at 5–9; R. 36-1 at 4–6.

A party can challenge a federal court's jurisdiction in two ways. A facial challenge "questions merely the sufficiency of the pleading," *i.e.*, the party argues that, even taking the alleged facts as true, they fail to establish subject-matter jurisdiction. *Gentek*, 491 F.3d at 330. A factual challenge, by contrast, "raises a factual controversy," *i.e.*, the party disputes

3

the alleged facts and argues that the real ones do not establish federal jurisdiction. *Id.* The challenge here is facial. Everyone agrees on the salient fact: that Johnson filed suit before voluntarily dismissing his agency appeal. The parties just disagree on what this fact means. The Secretary and Elkhorn argue that it deprives this Court of jurisdiction. Johnson argues that it does not.

## II.   Discussion

Surface-mining disputes fall under the Surface Mining Control and Reclamation Act ("SMCRA"). SMCRA's judicial-review provision allows courts to review "[a]ny order or decision issued by the [Interior] Secretary." 30 U.S.C. § 1276(a)(2). But SMCRA also provides remedies from within the Department of the Interior itself. Miners and landowners may ask the agency to review any "order [issued] by the Secretary" or any "modification, vacation, or termination" of an order that affects their rights. *Id.* § 1275(a)(1); *see also id.* § 1275(c) (permitting temporary relief from an order). Thus, landowners looking to halt an unlawful surface-mining project can do so either in court or through the agency.

But the Secretary and Elkhorn argue that landowners must go to the agency first, exhausting their opportunities to get relief from the Secretary before heading into court. *See* R. 35-1 at 5–6; R. 36-1 at 5–6. Until then, the defendants argue, the Secretary has issued no final "order," and a court therefore has nothing to review. *See* R. 35-1 at 5–6; R. 36-1 at 6.

They do have a point: "In most cases, a failure to exhaust administrative remedies is fatal to a suit in federal court." *See Kentucky v. United States ex rel. Hagel*, 759 F.3d 588, 599 (6th Cir. 2014). The so-called exhaustion requirement directs parties to seek relief from the relevant agency—if that agency can provide the relief—before seeking it in federal court.

4

A litigant has exhausted its opportunities for administrative relief when the agency has reached a final decision on its claims. *See Weinberger v. Salfi*, 422 U.S. 749, 763–64 (1975). Thus, heading to court, a litigant must wait for the agency to give it a final decision.

But the exhaustion requirement is not one size fits all. Different statutes will sport different styles. Some are more strict, some more loose. Some permit judges to let the hem out a little, by applying an exception to the requirement; some do not. *See, e.g.*, *Hagel*, 759 F.3d at 598 (distinguishing between stricter and looser requirements). To determine whether Johnson has filled out SMCRA's exhaustion requirement, therefore, the Court must take its measure. Doing so requires the Court to ask three questions.

### A.  Is SMCRA exhaustion mandatory or merely jurisprudential?

In most cases, exhaustion is a "prudential, court-created doctrine." *Perkovic v. INS*, 33 F.3d 615, 619 (6th Cir. 1994). Courts create the doctrine in the interests of three groups affected by any given dispute. First, the parties themselves. Some problems "require [the] application of special expertise" to resolve. *McKart v. United States*, 395 U.S. 185, 194 (1969). Judges know something about the law, but next to nothing about surface mining. The exhaustion doctrine keeps problems before the proper problem solvers, allowing the agency to apply its expertise without judicial "interfere[nce]." *Id*. The second group is the courts. If the case does make it to federal court, "judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record," *id*.—so it benefits the court to let the agency build the record. And third, Congress. When Congress grants an agency certain powers, it likely does not want to come back and see those powers sitting on a shelf, unused. To prevent such disuse, courts have "fashion[ed]" rules—like the exhaustion

5

requirement—to channel disputes through the administrative schemes that Congress has made especially for them. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1994). Thus, before a dispute leaves the belly of the administrative state, courts will often require it to gestate within the agency for an appropriate time.

But this is the judiciary's choice. If "Congress has not clearly required exhaustion, sound judicial discretion governs" just how much exhaustion to require. *Dixie Fuel Co. v. Comm'r of Soc. Sec'y*, 171 F.3d 1052, 1059 (6th Cir. 1999) (quoting *McCarthy*, 503 U.S. at 144). The doctrine is only prudential, after all, helping courts decide whether hearing a case would be a good idea. Since courts created the doctrine, they can do with it what they like. Specifically, they "can craft prudential exceptions." *Hagel*, 759 F.3d at 598. If, for example, exhaustion would be futile—because failure before the agency is foregone and a return to it like the Charge of the Light Brigade—a court can choose to hear an unexhausted claim. *See Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 505 (6th Cir. 2004).

Sometimes, Congress makes a court's life easier by explicitly putting an exhaustion requirement in the statute. *See, e.g.*, *Hoogerheide v. IRS*, 637 F.3d 634, 639 (6th Cir. 2011) (construing 26 U.S.C. § 7433). And Congress gets what it wants. Rather than prudential, therefore, statutory exhaustion requirements are mandatory.

The distinction matters. Both types of exhaustion requirements flow from the statute, just in different ways. If a statute constructs a remedial scheme, courts require parties to exhaust it because that is prudent. If a statute has a sentence that requires parties to exhaust, courts require them to do so because it is mandatory. As a result, mandatory exhaustion requirements have much less give. "[T]he courts lack discretion to waive" requirements that

6

Congress puts in its statutes. *Id.* Courts therefore may not "craft prudential exceptions" when an exhaustion requirement comes from the specific words of a statute rather than from general principles of prudent judging. *See Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001) ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); *McCarthy*, 503 U.S. at 144 ("Where Congress specifically mandates, exhaustion is required.").[1]

So the first question is whether, under SMCRA, the Court *should* require Johnson to exhaust administrative remedies as a matter of judicial prudence, or whether it *must* require exhaustion as a matter of Congressional will.

### 1.  What Congress has said

The first place to look is at what Congress actually wrote. Congress provided judicial review for the kind of adjudication at issue here in SMCRA's Section 1276. *See* 30 U.S.C. § 1276(a)(2). And nowhere in that section did Congress mention exhaustion. Compare this to Section 7433 of the Internal Revenue Code (which the Sixth Circuit interpreted in *Hoogerheide*), where Congress explicitly placed a "[r]equirement that administrative remedies be exhausted." 26 U.S.C. § 7433(d).

---

[1]  In *Hagel*, the Sixth Circuit wrote that courts "can craft prudential exceptions to non-jurisdictional exhaustion requirements." 759 F.3d at 598. This phrasing might imply that courts can craft such exceptions even when exhaustion is mandatory, so long as the requirement is not jurisdictional. (The jurisdictional distinction is discussed in the next section.) But the licensing statute the *Hagel* court was construing does not mandate exhaustion. *See id.* (quoting 20 U.S.C. § 107d–1(b)). Moreover, the *Hagel* court explicitly called that statute's exhaustion requirement "[j]urisprudential." *Id.* at 599. Other language aside, then, it appears that the court meant to treat that requirement as non-mandatory and thus not to overturn earlier cases where the Sixth Circuit—and the Supreme Court—have said that exceptions are unavailable when exhaustion is mandatory, *i.e.*, explicitly required by the statute.

Clearly, Congress knows how to tell courts to require exhaustion. In SMCRA, it did not. Thus, it would seem that SMCRA exhaustion is not mandatory: Courts should require exhaustion not because Congress told them to, but for their own jurisprudential reasons.

### 2.   What the Sixth Circuit has said

In two cases, however, the Sixth Circuit appears to have read the statute differently. In *Shawnee Coal Company v. Andrus*, the court held that parties are "required to exhaust [the] administrative remedies" available under SMCRA "before obtaining judicial review." 661 F.2d 1083, 1092 (6th Cir. 1981). Then in *Southern Ohio Coal Company v. OSMRE*, the court followed *Shawnee* and went on to explain that this requirement is the will of Congress: "SMCRA unambiguously requires resort to the prescribed administrative review process before seeking judicial review." 20 F.3d 1418, 1425 (6th Cir. 1994). According to these two holdings, then, SMCRA exhaustion is mandatory: a creature of the statute itself.

### 3.   What to do

For at least three reasons, it seems possible that the *Shawnee* and *Southern Ohio* courts intended to impose a jurisprudential—rather than mandatory—exhaustion requirement under SMCRA. First, as discussed above, SMCRA does not explicitly require exhaustion. Then, as now, the statute did not contain the word "exhaustion," and thus the court did not say that it did. Rather, in *Shawnee*, the court reasoned that parties are "required to exhaust" because "Congress has provided a well-defined administrative system for" them to utilize. 661 F.2d at 1092; *see also id.* ("The ready availability of adequate administrative relief also dictates that an aggrieved party exhaust its administrative remedies before procuring judicial review."). And this is the second reason why *Shawnee* might actually have announced a

8

jurisprudential requirement:  Respect for a "well-defined administrative system" is a typical jurisprudential reason for requiring exhaustion (and thus preventing courts from interfering with that system).  Third, and probably most tellingly, both the *Shawnee* and *Southern Ohio* courts considered whether any exceptions to SMCRA's exhaustion requirement might apply. *Shawnee*, 661 F.2d at 1092–95; *Southern Ohio*, 20 F.3d at 1423–25.  Yet those exceptions would be unavailable if SMCRA exhaustion were mandatory.  *See Hoogerheide*, 637 F.3d at 639 ("It is a congressionally established exhaustion imperative . . . and accordingly the courts lack discretion to waive it.").

One could argue that, to be faithful to *Shawnee* and *Southern Ohio*, the Court must apply them holistically.  Though "SMCRA unambiguously requires" exhaustion, *Southern Ohio*, 20 F.3d at 1425, the Court would nevertheless look for a prudent exception.  If so, then Johnson might well deserve to keep its seat in federal court.  The agency appears to have put Johnson in a bind.  *See infra* Part II.A.  Under a regulation, the ALJ's decision in Johnson's administrative suit is "final so as to be [an] agency action subject to judicial review."  43 C.F.R. § 4.21(c).  While litigating this case, however, the Secretary has interpreted that regulation to make the ALJ's decision "effective," but (rather head-scratchingly) not final. R. 35-1 at 5–6.  So, for Johnson, returning to the agency would probably be futile—and if exceptions could apply, one would apply here.  *See Coomer*, 370 F.3d at 505.

But this Court is bound by what the Sixth Circuit has held, not by the Court's own psychoanalysis of those holdings.  The Sixth Circuit has held that "SMCRA unambiguously requires" exhaustion.  *Southern Ohio*, 20 F.3d at 1425.  Since "the courts lack discretion to waive" statutory exhaustion requirements, *Hoogerheide*, 637 F.3d at 639, whatever the

*Shawnee* and *Southern Ohio* courts said about prudential exceptions was—in effect—dicta. That dicta is not controlling here. *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.) ("If [a court's statements] go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."); *see also Grundy Mining Co. v. Flynn*, 353 F.3d 467, 479 (6th Cir. 2003) ("[W]e are bound by the published opinions of previous panels, and this rule encompasses all parts of a prior ruling that are properly construed as holdings rather than dicta.").  Nor is it persuasive.  According to the Sixth Circuit, Congress has mandated the SMCA exhaustion requirement.  By applying prudential exceptions to that requirement, the Court would take for itself the very discretion it inherently lacks: to tunnel underneath statutes.

One might respond by taking this argument to its extreme.  If the Court is going to read *Shawnee* and *Southern Ohio* narrowly, the response goes, then it should winnow them all the way down and apply them only to the specific SMCRA provision that both addressed (its temporary-relief provision).  *Shawnee*, 661 F.2d at 1091–92; *Southern Ohio*, 20 F.3d at 1422–23.  Exhaustion would thus be jurisdictional when a party seeks "temporary relief from any notice or order issued" by the Secretary, 30 U.S.C. § 1275(c), but nonjurisdictional—only mandatory—for all other kinds of relief.

But that is not how the Sixth Circuit put the rule.  The *Shawnee* and *Southern Ohio* courts did not knight a specific SMCRA provision as more mandatory than the rest.  Rather, the *Southern Ohio* court said that a plaintiff fails to establish federal jurisdiction whenever it "fail[s] to exhaust the administrative remedies provided in 30 U.S.C. § 1275"—the whole thing—"before seeking judicial review under section 1276."  *Southern Ohio*, 20 F.3d at

10

1422.  In describing those "administrative remedies," the *Shawnee* court ran through the whole gamut available under SMCRA.  *See* 661 F.2d at 1091 ("[Section] 525(a)(1) allows a permitee or person adversely affected by an order of the Secretary to apply to the Secretary for relief, and in that event requires the Secretary to conduct an appropriate investigation. . . . After the investigatory process is completed the Secretary must make findings of fact in issuing a written decision.").  And it made clear that the "basic purpose" of exhaustion is to "limit[] judicial interruption" of those "agency proceedings."  *Id*. at 1092.  That interruption could be just as disruptive here as it would have been to the parties there.  More disruptive, even.  There, the plaintiffs had not yet begun any agency proceedings; here, the agency was in the process of reviewing Johnson's case when Johnson brought that case to court.  Thus, by failing to exhaust, Johnson has given the Court an opportunity to do precisely what the *Shawnee* and *Southern Ohio* courts intended to prevent.

Granted, divining that intent requires looking at possible dicta; the "basic purpose" reasoning is largely prudential, and thus not necessary to the court's holding that SMCRA exhaustion is statutorily mandated.  *Id*. at 1092.  There is certainly a tension in considering these parts of *Shawnee* and *Southern Ohio* but not the parts discussing prudential exceptions.  But that tension appears unavoidable, as it is the result of resting a mandatory requirement on prudential reasons.  The exhaustion requirement must be based on something.  And without a mandate from the statutory text, the *Shawnee* and *Southern Ohio* courts based it on respect for the entire statutory structure.  That decision was prudent; the only difficulty is that the Sixth Circuit called it mandatory.  Those difficulties have been parsed.  For now, the Court must apply what the Sixth Circuit has said.  Although mandatory exhaustion requirements

11

normally come from statutes, and SMCRA does not seem to contain such a requirement, SMCRA exhaustion is mandatory in the Sixth Circuit.

### B.  Is SMCRA exhaustion jurisdictional or a claims-processing requirement?

If SMCRA exhaustion is mandatory, just how mandatory is it?  Congress can mandate exhaustion in two ways: as either a jurisdictional or a "claims-processing" requirement. *Hoogerheide*, 637 F.3d at 636.

"There is a subtle, but important, difference" between the two.  *Hagel*, 759 F.3d at 598.  A court's jurisdiction determines its power to hear a case in the first instance.  Courts do not establish the boundaries of their jurisdiction for themselves; otherwise, it might extend to the horizon.  Rather, Congress puts up the fences; after all, Congress has "the power to establish the [federal] courts" in the first place, and with that power comes the lesser power to "define their respective jurisdictions."  *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 448 (1850). And if Congress chooses to make a particular fence taller—by requiring, as a jurisdictional prerequisite, that litigants exhaust their administrative remedies—then the federal courts lack jurisdiction over a dispute until it has passed through the relevant agency.  *See Perkovic*, 33 F.3d at 619; *see also Bangura v. Hansen*, 434 F.3d 487, 493 n.1 (6th Cir. 2006) ("[F]ailure to exhaust only deprives this Court of subject matter jurisdiction when exhaustion is required by a jurisdictional statute.").

Then again, Congress might be worried only about processing claims, *i.e.*, filtering them through the agencies that it has created to hear them.  If that's the case, a mandatory exhaustion requirement will impose a slightly lower barrier.  When not jurisdictional, "exhaustion is 'typically regard[ed] . . . as an affirmative defense.'"  *Hoogerheide*, 637 F.3d

12

at 638 (quoting *Jones v. Bock*, 549 U.S. 199, 212 (2007)). The requirement is still mandatory; if the defendant can prove that the plaintiff failed to exhaust, that will end the matter. But however the case comes out, a federal court can still *hear* it: This type of exhaustion requirement limits the plaintiff's entitlement to relief, not the court's jurisdiction.

This theoretical distinction has practical consequences. Under the rules of procedure, a federal court can—indeed, it must—dismiss a case the moment it realizes that it lacks jurisdiction over it. *See* Fed. R. Civ. P. 12(h)(3). And a court must know its own limits, dismissing a case *sua sponte* when it notices a jurisdictional problem before the parties do. *See Franzel v. Kerr Mfg. Co.*, 959 F.2d 628, 629–30 (6th Cir. 1992). When exhaustion is not a jurisdictional issue, though, the court has no independent duty to run a background check on the plaintiff's administrative doings. That type of exhaustion is an affirmative defense, so the defendant must raise the issue itself. *See Jones*, 549 U.S. at 212–16. If it fails to do so, or chooses not to do so, then the issue is waived and the plaintiff can proceed in court even though he did not exhaust. *See Hettinga v. United States*, 560 F.3d 498, 503 (D.C. Cir. 2009) (noting that nonjurisdictional exhaustion can be waived).

"[T]he distinction between jurisdictional conditions and claim-processing rules," however, has proven "confusing in practice." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010). Courts have sometimes dismissed cases for lack of jurisdiction when they might really have meant to do so for claim-processing reasons. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511–13 (2006) (discussing such cases). If a plaintiff failed to establish some "threshold fact" that a statute requires—like administrative exhaustion—courts used to be in the practice of dismissing "for lack of jurisdiction" without assessing whether the statute

13

merely requires that threshold fact, or requires it as a prerequisite to jurisdiction.  *Id*. at 511.

Because marking an issue as jurisdictional has consequences, these "drive-by jurisdictional

rulings" caused confusion for courts down the road.  *Steel Co. v. Citizens for a Better Env't*,

523 U.S. 83, 91 (1998); *see also id*. (collecting more cases).

To curb this confusion, the Supreme Court "has instituted a clear-statement rule."

*Hagel*, 759 F.3d at 597.  Courts may treat a threshold statutory requirement (like exhaustion)

as jurisdictional only if Congress "clearly states" in the statutory text that the requirement

"shall count as jurisdictional."  *Arbaugh*, 546 U.S. at 515.  That statement must come in

"sweeping and direct language" if it is to "remove [courts'] power to hear unexhausted

claims."  *Herr v. U.S. Forest Serv.*, 803 F.3d 809, 822 (6th Cir. 2015).  If a statute does not

"provide clear evidence[] that the provision was meant to carry jurisdictional consequences,"

the courts cannot put words in Congress's mouth.  *Henderson ex rel. Henderson v. Shinseki*,

562 U.S. 428, 438 (2011).

### 1.  What Congress has said

So the second question is whether SMCRA's mandatory exhaustion requirement is

also jurisdictional.  The answer must come from the words in the statute.  Judging just from

the words—where any "clear statements" would be—exhaustion is not a jurisdictional

requirement of SMCRA.  The relevant provision gives federal courts jurisdiction to review

"[a]ny order or decision issued by the Secretary."  30 U.S.C. § 1276(a)(2).  Yet the word

"exhaustion" appears nowhere in this provision, strong *prima facie* evidence that Congress

was not considering exhaustion—let alone as a jurisdictional prerequisite—while writing this

particular provision.  *Cf. Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 402 (6th Cir. 2008)

(finding a statutory requirement mandatory but nonjurisdictional in part because "[t]he term 'jurisdiction' . . . never appears in th[e] provision's text").

Nor does this judicial-review provision otherwise appear to "speak in jurisdictional terms," at least not when it comes to exhaustion. *Hoogerheide*, 635 F.3d at 637 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). The word "jurisdiction" appears just once in the provision, where Congress wrote that in cases "under [SMCRA's] penalty section," courts "shall have jurisdiction to enter an order requiring payment of any civil penalty assess[ed]" under that section. *Id*. If one part of a statute "speaks directly to jurisdiction," a court can presume that Congress has chosen its words carefully—and not to limit jurisdiction through provisions where it did not even use the word. *Allen*, 545 F.3d at 402; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("Context is a primary determinant of meaning.").

This is not to say that SMCRA plaintiffs are free of administrative process altogether. A mandatory requirement is still a mandatory requirement, even if not a jurisdictional one. *See Hoogerheide*, 637 F.3d at 639. If a statute requires exhaustion—as the Court is assuming SMCRA does—the plaintiff still must exhaust. The point is simply that SMCRA plaintiffs must exhaust to deserve federal-court relief, not to establish a federal court's jurisdiction. Because if exhaustion were a jurisdictional requirement under SMCRA, Congress would have had to say so clearly. *See Arbaugh*, 546 U.S. at 515–16. Such clarity would manifest in words like, "No federal suit shall lie until the plaintiff has pursued all the available options for relief before the agency." Or even simpler: "Exhaustion is a requirement for federal jurisdiction." *See Hoogerheide*, 637 U.S. at 638 (compiling jurisdictional exhaustion clauses

from different statutes).   Since SMCRA contains no such statement, it would seem that "courts should treat [exhaustion] as nonjurisdictional in character," and thus not ascribe to it all the baggage that jurisdictional requirements carry.  *Arbaugh*, 546 U.S. at 516.

### 2.   What the Sixth Circuit has said

But the Sixth Circuit has read the statute differently.  The two relevant cases will be familiar.  In *Shawnee*, OSMRE ordered a coal company to cease operating a coal tipple, machinery that crushes coal and preps it for transport.  661 F.2d at 1087–89.  The company sought a preliminary injunction, which the district court granted.  *Id*. at 1089.  The Sixth Circuit reversed, holding that the district court had no jurisdiction to issue the injunction because the company had not sought temporary relief from the agency itself.  *Id*. at 1090–95.  In *Southern Ohio*, OSMRE ordered another coal company to halt its plans to pump the water that was flooding its mines into surrounding creeks and streams.  20 F.3d at 1420–21.  The company then sought a preliminary injunction, which the district court granted.  *Id*. at 1422.  And again, the Sixth Circuit reversed, holding that *Shawnee* controlled, and thus, that the district court lacked jurisdiction to grant the injunction.  *Id*. at 1422–23.

In the Sixth Circuit, then, exhaustion is a mandatory, jurisdictional requirement under SMCRA.  Given *Shawnee* and *Southern Ohio*, when a Kentucky landowner or miner "fail[s] to exhaust the administrative remedies provided in [SMCRA section] 1275 before seeking judicial review under section 1276," a federal court "lack[s] jurisdiction" over the party's SMCRA claim.  *Southern Ohio*, 20 F.3d at 1422; *see also Shawnee*, 661 F.2d at 1090–95.

### 3.  What to do

*Shawnee* and *Southern Ohio* have some years under the belt.  Both come from the era before the Supreme Court "b[rought] some discipline to the use of the term jurisdictional" with the clear-statement rule.  33 Charles Alan Wright & Charles H. Koch, Jr., Fed. Prac. & Proc. Judicial Review § 8398 (1st ed.), Westlaw (database updated Apr. 2016) (internal quotation mark omitted).  And in the intervening years, it appears that no one has challenged *Shawnee* and *Southern Ohio*.  Until now:  Johnson has come right out and said that *Shawnee* and *Southern Ohio* are "wrongly decided."  R. 37 at 33.  As such, Johnson argues, they can be decommissioned and the Court can treat SMCRA exhaustion as nonjurisdictional.  Two arguments might support this "upgrade."   Ultimately, though, neither overrides the Court's duty to abide by the Sixth Circuit's explicit holdings.

First, *Shawnee* and *Southern Ohio* seem the kind of "drive-by jurisdictional rulings" that the Supreme Court cautioned against.  *Steel Co.*, 523 U.S. at 91.  Perhaps most tellingly, the Sixth Circuit did not immediately stop and dismiss either case for lack of jurisdiction the moment it realized that the plaintiff had not exhausted.  The court went on to consider if any prudential exceptions applied.  *See Shawnee*, 661 F.2d at 1092–95; *Southern Ohio*, 20 F.3d at 1423–25.  If the court really meant what it held, the argument goes, then no such exception *could* apply; jurisdictional fences cannot be snuck through.  *See Hagel*, 759 F.3d at 598–99.  So maybe the court did not mean quite what it held:  Although it said SMCRA exhaustion is jurisdictional, it treated that requirement as nonjurisdictional.

Indeed, though the holdings were jurisdictional, the reasoning was largely prudential.  The court noted that SMCRA's "authorization of judicial review is inextricably intertwined

with the administrative review procedures" that the law also creates. *Shawnee*, 661 F.2d at 1091; *see also Southern Ohio*, 20 F.3d at 1423 (same). But intertwinement alone does not turn administrative procedures into *jurisdictional* requirements. Whenever a statute provides administrative remedies and judicial review, the two are always "inextricably intertwined." *Id.* If such remedies exist, courts will usually require litigants to exhaust them; that is just prudent judging. *See Hagel*, 759 F.3d at 599. The finer-grained question is *how* intertwined administrative remedies and judicial review are. To intertwine them in a jurisdictional way, Congress must use a clear statement. *Arbaugh*, 546 U.S. at 515. Neither the *Shawnee* nor *Southern Ohio* courts found such a statement in SMCRA. Instead, both relied on a quotation not from Congress, but from a Supreme Court case: *Hodel v. Virginia Surface Mining and Reclamation Association*, 452 U.S. 264, 298–99 (1981). *See Shawnee*, 661 F.2d at 1091; *Southern Ohio*, 20 F.3d at 1422–23. There the Court marked channels for administrative relief open to aggrieved landowners and miners. But even that Court did not identify a clear statement in the text of SMCRA that exhaustion is jurisdictional. Out of respect for the work Congress does to dredge administrative channels, federal courts require parties to use them. Yet that is true under any exhaustion rule. Whether parties must use them for jurisdictional or merely prudential reasons, neither SMCRA nor *Hodel* makes clear.

After looking at SMCRA again, the Sixth Circuit might read it differently than before. In the meantime, the Supreme Court "ha[s] often said that drive-by jurisdictional rulings of this sort . . . have no precedential effect." *Steel Co.*, 523 U.S. at 91; *see id.* (collecting cases). Thus, one might argue that *Shawnee* and *Southern Ohio* do not bind this Court.

18

But it is one thing for the Supreme Court to throw shade on its own rulings.  It is quite another thing for this Court to disregard the Sixth Circuit.  And the Supreme Court did not say that a district court gets to choose which controlling rulings have "precedential effect" and which do not.  The Sixth Circuit has explicitly held that exhaustion is a jurisdictional requirement under SMCRA.  Although it has since recognized that Congress only creates such jurisdictional requirements through clear statements, *see Hagel*, 759 F.3d at 597, and although SMCRA does not seem to contain such a statement, the Sixth Circuit has not overturned *Shawnee* and *Southern Ohio*.  Those decisions therefore bind the Court "unless an inconsistent decision of the United States Supreme Court requires modification" or until the Sixth Circuit sitting *en banc* overrules them itself.  *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).

Arguably, the clear-statement rule is "an inconsistent decision of the United States Supreme Court" that requires modifying *Shawnee* and *Southern Ohio*.  *Id*.  If this Court were the Sixth Circuit, it very well might find that the time for renovating its case law has come.  But this court is not the Sixth Circuit.  And the Court has found no support for modifying from below, *i.e.*, hijacking the rule about when the *circuit court* may overturn itself to enable a *district court* to overturn the circuit.  Nor, indeed, has it found support for doing so when the Supreme Court has not rendered an "inconsistent decision" about how to read a particular statute, but rather a new canon for reading statutes in general (as is the case here).  A lower court with that weapon in its hands could wreak havoc on the law; any creative judge could find a way to disobey a specific circuit holding whenever the Supreme Court has announced

19

a rule in another context. It is the specific circuit holding—that SMCRA exhaustion is jurisdictional—and not the general clear-statement rule that binds the Court here.

The second argument for treating SMCRA exhaustion as nonjurisdictional is that doing so might not be completely unfaithful to *Shawnee* and *Southern Ohio*. In both cases, the Sixth Circuit at least gave lip service to prudential exceptions. *See Shawnee*, 661 F.2d at 1092–95; *Southern Ohio*, 20 F.3d at 1423–25. And if one of those exceptions had applied, maybe the court would have applied it.

But this argument fails for the same reasons it failed earlier. *See supra* Part II.A.3. This Court is bound by what the Sixth Circuit has held, not by what it might have held. *See Grundy Mining Co.*, 353 F.3d at 479. The Sixth Circuit has "h[eld] that the [federal] court[s] lack[] jurisdiction" when a party has "failed to exhaust the administrative remedies" that SMCRA provides. *Southern Ohio*, 20 F.3d at 1422. Lacking jurisdiction has the same effect today that it had back then—indeed, that it has always had. When a court lacks jurisdiction, it lacks "the power to hear and determine the subject matter in controversy between the parties." *Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 714 (1838). Since that was the basis of the holdings in *Shawnee* and *Southern Ohio*, that was also their extent. Although those courts considered prudential exceptions, if exhaustion is a jurisdictional requirement they would have had no power to apply one. Nor does this Court.

Moreover, the problems of letting courts tunnel underneath statutory requirements, *see supra* Part II.A.3, are even worse if the requirement is jurisdictional. A federal court may not define its own jurisdiction. It might like to, of course; the impulse is familiar to anyone who has ever had (or been) a child in open rebellion against her bedtime, demanding as a

20

concession the power to set it herself.  But give someone the power to decide her own power, what happens?  Sooner or later, her power will be limitless.  *See* The Essential Antifederalist at xxix–xx (W. Allen & G. Lloyd eds., 2d ed. 2002) (noting the founding generation's fear, voiced by the Antifederalists, "that an independent federal judiciary would . . . substitute its own will in place of the will of the people . . . [and] that the Constitution actually mandated the justices to invoke the now famous and, to the Antifederalists, regime-corrupting axiom that, while we live under a Constitution, the Constitution is what the justices say it is"); *see also* The Federalist No. 78, at 464 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (responding that "liberty can have nothing to fear from the judiciary alone," although it "would have everything to fear [the judiciary's] union with either of the other departments").  To prevent such abuse, the Constitution wisely withholds the power over federal jurisdiction from the federal courts.  Instead, it gives that power to Congress.  *Sheldon*, 49 U.S. at 441.  And Congress's rules—just like lights-out at nine o'clock—must be strictly enforced.

Ever since the Supreme Court announced this clear-statement rule, "several statutory requirements that were previously considered jurisdictional have been reconsidered." *Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 789 (6th Cir. 2012).  SMCRA seems a prime candidate.  But this Court is not the right one to reconsider it.  The Court's duty is to apply what the Sixth Circuit has held, and thus to treat SMCRA exhaustion as not only mandatory, but jurisdictional.

## C. Assuming SMCRA exhaustion is a mandatory jurisdictional requirement, has Johnson satisfied it?

Even if SMCRA exhaustion is a jurisdictional requirement, the Court could still have jurisdiction over this case—because, obviously, Johnson could have already exhausted the available administrative remedies. Johnson argues that it has. R. 37 at 19–29. Specifically, it argues that it has received a final decision from the agency. That argument might seem implausible, given Johnson's Irish goodbye from the Appeals Board. But actually, it is not. Agencies have discretion to define when their own actions are final. *Weinberger*, 422 U.S. at 766. So the third question is: What constitutes a final action here?

### 1. What the agency has said

A lot has happened since the Sixth Circuit decided *Shawnee* and *Southern Ohio*. The Chicago Cubs won the World Series, multiple Secretaries of the Interior cycled through the government, and those Secretaries issued a pile of regulations. And it is those regulations, Johnson says, that delineate the exhaustion requirement—not SMCRA itself. R. 37 at 19–29.

Johnson homes in on one regulation specifically: 43 C.F.R. § 4.21(c), which discusses the "[e]xhaustion of administrative remedies." Under that provision, no agency decision that a party can still appeal within the agency "shall be considered final so as to be [an] agency action subject to judicial review" unless—among other things—a party petitions the Appeals Board to stay the decision and the decision "has been made effective in the manner provided in paragraphs (a)(3) or (b)(4)" of this same regulation. 43 C.F.R. § 4.21(c). Flipping to those sections, if the Appeals Board "fails to act on the petition [for a stay] within" forty-five days of the parties' deadline to appeal, then the ALJ's underlying decision "will become

effective immediately." *Id.* §§ 4.21(a)(3), (b)(4). In short, if a party asks the Appeals Board to stay some decision, and the Board does nothing for a long enough time, then the decision is final. Here, Johnson waited for forty-five days after its appeal deadline for the Appeals Board to rule on its stay petition. The Appeals Board never did. So Johnson filed its current complaint. Because the Board waited too long, Johnson argues, the ALJ's decision became effective, final, and judicially reviewable. *See* R. 37 at 29–31.

The Secretary reads the regulation differently. In her view, Section 4.21 renders an ALJ decision *effective* if the Board has sat on a petition for forty-five days, but not final— and thus not judicially reviewable. She relies on *Bennett v. Spear*, 520 U.S. 154 (1997), for the proposition that effectiveness is just one part of finality. R. 35-1 at 5–6. Generally,

> two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Bennett*, 520 U.S. at 177–78 (internal citations omitted). Effectiveness matters only to the second part of that definition. The first part requires that the action be more than tentative— the agency must lack any further opportunity to change it. And nothing in Section 4.21, the Secretary points out, says that the Appeals Board can *only* decide a stay petition within forty-five days—that it *must* make a decision within that timeframe *or else*. R. 35-1 at 5–6. Because its process had never consummated, the agency argues, it never gave Johnson a final decision to challenge, regardless of what its own regulation says.

23

## 2.   Whether that interpretation binds the Court

Normally, courts must defer to an agency's interpretation of its own regulations—even when the agency states that interpretation in a legal brief.  *See Auer v. Robbins*, 519 U.S. 452, 461–62 (1997).  *But see Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1213 (2015) (Thomas, J., concurring in the judgment) ("Because this doctrine effects a transfer of the judicial power to an executive agency, it raises constitutional concerns.").  Courts defer even when others might be inclined to tell the agency, "I wouldn't do that if I were you." *See Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1341 (2013) (Scalia, J., dissenting) (pointing out that so-called *Auer* deference puts "the power to write a law and the power to interpret it . . . in the same hands," and the problems that ensue). Courts need not defer, however, when an agency's interpretation is "plainly erroneous or inconsistent with the regulation" in question.  *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945).  Is that true of the Secretary's here?

Johnson says that it is.  R. 37 at 29–31.  Johnson has at least three things on its side, and those three things are ultimately enough.  First, the regulation.  Putting its negative sentence construction in positive form, Section 4.21 says that an ALJ decision "shall be considered final so as to be [an] agency action subject to judicial review" if the decision "has been made *effective* in the manner provided" in other parts of the regulation, including the forty-five-day no-action rule.  43 C.F.R. § 4.21(c) (emphasis added).  Though the *Bennett* Court did say that—"as a *general* matter"—finality includes effectiveness and non-tentativeness, it did not say that agencies could not define the term more specifically to meet their needs.  *Bennett*, 520 U.S. at 177 (emphasis added).  That decision notwithstanding,

24

agencies still have leeway to do what they are uniquely well-positioned to do and indeed what earlier cases like *Weinberger* allow them to do: define when their decisions are "final." The Department of the Interior has done so, allowing parties to move over to federal court if the agency does not act in time. The goal behind this self-imposed deadline was certainly a noble one. But the agency's position today is inconsistent with that goal: Its interpretation of its regulation overlooks the regulation's words. Such interpretations warrant no deference. *See Seminole Rock*, 325 U.S. at 414.

Second, the Constitution. The three branches of government are supposed to check and balance one another. Congress can check the judiciary by limiting federal jurisdiction. *See, e.g.*, *United Pub. Workers of Am. v. Mitchell*, 330 U.S. 75, 90–91 (1947). Meanwhile, the judiciary can check the executive because most agency actions are presumptively subject to judicial review. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Since it can limit federal jurisdiction, Congress sometimes rebuts that presumption and limits judicial review of agency conduct. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). But that is very different from "permitting the *agency* to insulate its own decisions from judicial review," something the Supreme Court has "soundly rejected" under other statutes. *Gor v. Holder*, 607 F.3d 180, 188 (6th Cir. 2010) (discussing *Kucana v. Holder*, 558 U.S. 233 (2010)).

Think of the results here. The Secretary argues that her actions can be effective but not final, and thus unreviewable. That means the agency can effectively shut down a mine, or allow someone's property to be stripped bare, without fear that a court might someday tell it to stop. Lest this dystopia seem unreal: SMCRA gives OSMRE the power to "issue cease-

25

and-desist orders"; to "vacate or modify or approve" its orders; to "suspen[d], revo[ke], or withhold[]" permits; and generally to "administer the programs for controlling surface coal mining operations." 30 U.S.C. § 1211(c)(1). And if such actions can become effective but not final in the way the Secretary says, then the agency can do any and all of those things without the check of judicial review. "To the Framers, the separation of powers and checks and balances were more than just theories. They were practical and real protections for individual liberty in the new Constitution." *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1216 (2015) (Thomas, J., concurring in the judgment). As usual, Madison said it best: "The accumulation of all powers, legislative, executive, and judiciary in the same hands . . . [is] the very definition of tyranny." The Federalist No. 47, at 298 (James Madison). Here, the agency proposes to do all three: pass a regulation (legislative), interpret that regulation (judicial), and enforce that interpretation (executive).

Granted, agencies have many powers these days—more than the Founders intended. But none have power to set themselves completely apart. *Id.*; The Federalist No. 51, at 318 (James Madison) ("[T]he great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others."); The Federalist No. 78, at 466 ("[T]he courts were designed to be an intermediate body between the people and the[ir representatives] in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts."). The Secretary's interpretation violates these principles; it therefore violates the separation of powers embedded in the framework of the Constitution.

26

*See Perez*, 135 S. Ct. at 1216 (Thomas, J., concurring in the judgment); *see also Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1149 (10th Cir. 2016) (Gorsuch, J., concurring) ("Under any conception of our separation of powers, I would have thought powerful and centralized authorities like today's administrative agencies would have warranted less deference from other branches, not more.").  And an interpretation that violates the Constitution is, of course, a "plainly erroneous" one that deserves no deference.  *Seminole Rock*, 325 U.S. at 414; *see also Stinson v. United States*, 508 U.S. 36, 45 (1993) ("[P]rovided an agency's interpretation of its own regulations does not violate the Constitution . . . it must be given [deference].").

Third, case law.  In *Weinberger*, the Supreme Court held that—when a statute leaves enough room to do so—an agency may define for itself what constitutes a "final action." 422 U.S. at 766–67.  Under the Social Security Act (the law at issue there), exhaustion was a "jurisdictional prerequisite," as the Sixth Circuit has said that it is under SMCRA.  *Id.* at 766. Yet "[t]he term 'final decision' is not only left undefined by the Act, but its meaning is left to the Secretary [of Health, Education, and Welfare] to flesh out by regulation."  *Id.*  And that Secretary seemed to think that he had reached a final decision as to the plaintiffs.  *Id.* at 767. So while the plaintiffs "f[e]ll short" of exhausting all the administrative remedies they could have exhausted—the statute offered some that they left on the table—the Court nevertheless had jurisdiction to hear their case.  *Id.* at 765–67.

The same would seem to apply here.  SMCRA itself does not define "final decision." Nor does it speak to the more esoteric question of what happens when the Appeals Board sits on a stay petition for over forty-five days.  Regulations do that.  One in particular says that, at a certain point, the agency's inactivity can morph into a "final [decision] so as to be [an]

27

agency action subject to judicial review."  43 C.F.R. § 4.21(c).  Since that point has come

and gone, the agency has given Johnson a ticket to federal court.

A more recent case, *Sackett v. E.P.A.*, 566 U.S. 120 (2012), also validates that ticket.

The Sacketts were building a house near a lake.  One day, they received a letter from the

Environmental Protection Agency ("EPA") informing them that they could either comply

with various water regulations or pay steep fines.  *Id.* at 123–25.  Instead, they went to court.

The government's position there should ring a bell:  While the agency action "expose[d] the

Sacketts to" significant penalties, the government argued that it was not final because the

agency process had not "consummat[ed]."  *Id.* at 126–27.  Specifically, the EPA's letter had

"invited the Sacketts to engage in informal discussion of the terms and requirements of the

order with the EPA."  *Id.* (internal quotation marks omitted).  The Supreme Court, however,

was unconvinced that the chance to discuss a decision makes it less final:  "The mere

possibility that an agency might reconsider in light of 'informal discussion' . . . does not

suffice to make an otherwise final agency action nonfinal."  *Id.*

A "possibility" is what the Interior offers the Johnsons here.  Although the agency has

made a decision that affects Johnson's land—a decision that its own regulation calls final—

the agency argues the decision is merely tentative because the Appeals Board might someday

decide Johnson's appeal.  R. 35-1 at 5–6.  When, the agency does not say.  Nor has it said

that the Board even *would* take time to decide a case that is already final; the incentives for a

busy tribunal to do so, and in a timely fashion, are small.  *Accord Sackett*, 566 U.S. at 127

(noting the possibility for reconsideration "confers no entitlement to further agency review").

Nor has the agency said what other relief opportunities Johnson could seek until the Board

28

makes up its mind, such as an emergency stay or expedited appeal.  Meanwhile, the agency concedes, its decision continues to affect Johnson's rights.  The pie-in-the-sky hope for a new decision was not an adequate alternative remedy for the Sacketts, who accrued tens of thousands in potential fines "each day they wait[ed] for the agency to drop the hammer." 566 U.S. at 127.  And it is not adequate here.  Thus, based on the regulations, Constitution, and case law, Johnson is subject to a final agency action that the Court can review.

One might respond in two ways:  First, that *Sackett* is distinguishable.  There, the judicial-review power came from the Administrative Procedure Act ("APA"); because the Sacketts had "no other adequate remedy in a court," the APA allowed the federal courts to review the Sacketts' challenge.  566 U.S. at 127; *see* 5 U.S.C. § 704.  Here, the Court need not rely on the APA since SMCRA itself provides for judicial review.  "Finality" can mean different things in cases where courts exercise their review powers under the APA versus a more specific statute.  *See* 5 U.S.C. § 704 (defining finality "[e]xcept as otherwise expressly required by statute"); *see also Southern Ohio*, 20 F.3d at 1425 (noting that "cases such as this"—*i.e.*, SMCRA cases—"are not governed by the APA").

But the distinction makes no difference here.  First of all, the Court has not treated this case as an APA case.  Instead, the Court has taken *Shawnee* and *Southern Ohio* on their terms:  According to the Sixth Circuit, SMCRA exhaustion is a jurisdictional requirement, mandating that parties wait for a final agency decision before coming to court.  Nevertheless, neither *Shawnee* nor *Southern Ohio* defines finality.  The agency thus has discretion to do so, and has used that discretion to define its action in Johnson's case as final.  And second of all, the Court has evoked *Sackett* mainly because it debunks the agency's effective-but-not-final

argument. Wherever the Court's power to review this case comes from, *Sackett* still serves

to show the illogic and unfairness of the agency's position.

The second response is also based on *Shawnee* and *Southern Ohio* and is a bit more

complex. Both cases are silent on the specific issue here: whether SMCRA gives the agency

discretion to say when its orders are "final," and thus whether SMCRA plaintiffs can come to

court even if they have "fall[en] short of meeting the literal requirement[s] of the statute."

*Weinberger*, 422 U.S. at 765. This silence makes the extent of those holdings rather unclear.

Both say that SMCRA exhaustion is jurisdictional. Such exhaustion requirements usually

come from a plain sentence in a statute. This one does not. Thus, the Court is left without its

usual guidepost: the statute. As a substitute, the *Shawnee* and *Southern Ohio* courts looked

at the whole statutory scheme, as mapped out by *Hodel*. *See Shawnee*, 661 F.2d at 1091;

*Southern Ohio*, 20 F.3d at 1422–23. But that is largely prudential reasoning. That reasoning

might make for expansive holdings. In other words, under *Shawnee* and *Southern Ohio*,

courts might lack jurisdiction over SMCRA claims until a plaintiff summits *Hodel* mountain,

*i.e.*, completely utilizes all options for administrative relief, even if that includes waiting for

an actual decision from the Appeals Board.

This argument shows the problems with resting a jurisdictional rule on prudential

grounds (what the Supreme Court more colorfully called a "drive-by jurisdictional ruling").

How much does the prudential reasoning inform the jurisdictional holding? How far can the

balloon expand? These might be questions for a tenure-track law review article. But they

are not questions that the Court needs to answer now. As discussed, the Court is bound by

30

the Sixth Circuit's jurisdictional holdings, not its prudential dicta.  And while its holdings require a final agency action, they do not require final actions of a certain type.

For this reason, a more obvious conclusion flows from the silence:  *Shawnee* and *Southern Ohio* simply do not define "finality" under SMCRA.  As the Supreme Court had made clear before the Sixth Circuit decided either case, the agency may define that word when the statue leaves it room to do so.  *Id*. at 766.  SMCRA appears to leave the agency that room, and neither *Shawnee* nor *Southern Ohio* seems interested in moving the walls closer together.  Both cases say that a party cannot come to court before getting a final decision from the agency.  But neither says that the agency cannot clarify what its "final decisions" look like.  Dog parks do not tell dog owners how many games of fetch their own pets need to get the ya-ya's out.  Likewise, while two controlling cases made exhaustion a jurisdictional prerequisite under SMCRA, they left the agency room to explain just how far a dispute needs to travel through its halls before becoming exhausted.  Put more simply, the Sixth Circuit's silence on this *Weinberger* question means *Weinberger* answers it:  The agency can say when its decisions are final, as the Interior's regulations say here.  *Weinberger*, 422 U.S. at 766.

In sum, the regulations state that Johnson received a final, reviewable decision from the agency; the Constitution would balk if the agency could insulate its decision from review; and the agency cannot do so (and get away with it) because the cases allow the Court to look behind formal definitions of finality at how the agency itself really understands the term.  The agency's litigating position runs afoul of all these precepts.  It deserves no deference.  Johnson need not wait for a day that might never come.  It is subject to a final agency action and may therefore be in court.

The Secretary makes one final argument, which also fails.  Under SMCRA, a plaintiff seeking judicial review of a final agency action must seek it within thirty days of that action. 30 U.S.C. § 1276(a)(2).  The Secretary argues that Johnson violated this rule because it did not file a complaint within thirty days of voluntarily dismissing its agency appeal.  R. 35-1 at 8–9.  That is because Johnson had already filed its complaint by then.  And it had filed that complaint within thirty days of when the ALJ's decision became "final so as to be . . . subject to judicial review" because the Appeals Board had failed to rule on Johnson's stay petition in time.  43 C.F.R. § 4.21(c).  Elkhorn is also wrong that Johnson needed to file its complaint within thirty days of the ALJ's decision, *i.e.*, before the Appeals Board ever got involved.  R. 36-1 at 12.  No one argues that the agency had rendered a final decision by that point. Rather, the agency's own regulations dictate that the ALJ's decision became a final agency action only after the Appeals Board failed to rule on Johnson's stay petition within forty-five days of Johnson's deadline to file that petition.  43 C.F.R. § 4.21(b)(4).  Because Johnson filed its complaint within thirty days of *that* point, the complaint was timely.

### III.   Conclusion

True to its name, the exhaustion doctrine has led a seemingly simple dispute through a doctrinal obstacle course.  But after the race comes the recap.  According to *Shawnee* and *Southern Ohio*, administrative exhaustion is a mandatory, jurisdictional requirement under SMCRA.  Although subsequent precedent—and the statute itself—seem to imply otherwise, those rulings bind the Court.  And ultimately, it does not matter whether SMCRA exhaustion is jurisprudential, mandatory, jurisdictionally mandatory, or merely a claims-processing rule,

because Johnson has exhausted its remedies to the extent the agency's regulations require.

Thus, the Court has subject-matter jurisdiction.

Accordingly, it is **ORDERED** as follows:

(1)     The Secretary's motion for judgment on the pleadings, R, 35, is **DENIED**.

(2)     Elkhorn's motion to dismiss for lack of subject-matter jurisdiction, R. 36, is

**DENIED**.

This the 15th day of February, 2017.

Signed By:

*Amul R. Thapar*   AT

**United States District Judge**

33